**BP CHEMICALS LIMITED,**
Plaintiff–Appellant,

v.

**UNION CARBIDE CORPORATION,**
Defendant–Appellee.

No. 91–1256.

United States Court of Appeals,
Federal Circuit.

Sept. 15, 1993.

Ford F. Farabow, Jr., Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, DC, argued for plaintiff-appellant. With him on the brief were Michael C. Elmer, J. Michael Jakes and Joann M. Neth. Also on the brief were Harold Haidt, G. Thomas Delahunty and Charles G. Mueller, Brooks, Haidt, Haffner & Delahunty, New York City, of counsel.

Nicholas M. Cannella, Fitzpatrick, Cella, Harper & Scinto, New York City, argued for defendant-appellee. With him on the brief were Joseph M. Fitzpatrick, Scott K. Reed and Steven C. Kline. Also on the brief were Norman L. Balmer and Robert C. Brown, Union Carbide Chemicals, Danbury, CT.

Before NEWMAN, LOURIE, and RADER, Circuit Judges.

PAULINE NEWMAN, Circuit Judge.

BP Chemicals Limited filed a declaratory judgment action against Union Carbide Corporation in the United States District Court for the Southern District of New York, seeking a declaration that Union Carbide's United States Patent No. 4,543,399, issued September 24, 1985, is invalid, unenforceable, and not infringed by BP Chemicals' process for the production of certain polymers. The district court dismissed the action for lack of a justiciable controversy.[1] We affirm.

*Background*

BP Chemicals and Union Carbide are competitors in the business of licensing technology for the manufacture of polymers of ethylene. The licensed technology includes process steps and plant design. The processes of both BP Chemicals and Union Carbide employ gas phase fluidized bed technology.

---

1. *BP Chemicals Ltd. v. Union Carbide Corp.*, 757 F.Supp. 303, 18 USPQ2d 1954 (S.D.N.Y.1991).

Union Carbide's Patent No. 4,543,399 (the '399 patent) relates to a step in the process called the "condensing mode". The condensing mode is said to improve the yield of polymer over that realized in a conventional fluidized bed, thereby providing savings in capital expenditure and production costs. The technology that is offered by BP Chemicals includes operation in the condensing mode. Union Carbide, in its competitive offerings to potential licensees, has stressed that the condensing mode is a patented advantage of the Carbide process technology.

BP Chemicals filed a declaratory judgment action, seeking declaration of invalidity or unenforceability of the '399 patent, and declaration that the '399 patent is not infringed by the condensing mode process step as licensed by BP Chemicals and potentially practiced by BP Chemicals' licensees. Union Carbide moved to dismiss the action for lack of a justiciable controversy. Union Carbide alternatively asked the district court to decline to exercise jurisdiction as a matter of judicial discretion.

After conducting an evidentiary hearing on the threshold question of whether the declaratory action should be entertained, the district court dismissed the action, finding that Union Carbide had not threatened to sue either BP Chemicals or any of its licensees for patent infringement.

BP Chemicals states on appeal that on the totality of the circumstances the requirements of a declaratory action have been met. BP Chemicals points to the commercial competition between the parties, and observes that Federal Circuit precedent has not treated the situation wherein a licensor's business is undermined by threats directed to it through its actual or potential licensees. BP Chemicals also points to its potential liability for contributory infringement or inducement to infringe, as well as its contractual obligations to indemnify its licensees.

Union Carbide responds that it did not threaten either BP Chemicals or any licensee with suit; that the '399 patent was not infringed and still has not been infringed; and that BP Chemicals is simply seeking an opportunity to litigate Union Carbide's patent prospectively, in order to obtain an advisory opinion on its validity and scope. Union Carbide states that any remarks it made about the '399 patent in the course of licensing negotiations were made in support of its attempts to license the Union Carbide process, and not to threaten or intimidate.

## A CASE OF ACTUAL CONTROVERSY

■ A declaratory judgment action may be brought in order to resolve an "actual controversy" between "interested" parties:

**28 U.S.C. § 2201.** In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1954 or a proceeding under section 505 or 1146 of title 11, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

The purpose of the Act is to enable a person who is reasonably at legal risk because of an unresolved dispute, to obtain judicial resolution of that dispute without having to await the commencement of legal action by the other side. It accommodates the practical situation wherein the interests of one side to the dispute may be served by delay in taking legal action. However, the controversy must be actual, not hypothetical or of uncertain prospective occurrence. The requirement of actual controversy encompasses concepts such as ripeness, standing, and the prohibition against advisory judicial rulings—all raised in this case.

■ There must be a "definite and concrete" dispute between adverse parties, appropriate to immediate and definitive determination of their legal rights. *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 239–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937). The obverse of a definite and concrete dispute may be described as an advisory opinion on a situation not ripe for litigation. *See id.* at

240–41, 57 S.Ct. at 463–64. The difference "is necessarily one of degree", *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941), and is determined on the totality of the circumstances. *Id.; C.R. Bard, Inc. v. Schwartz*, 716 F.2d 874, 880, 219 USPQ 197, 203 (Fed.Cir.1983). There is no simple rule that addresses all shades of relationships between disputants. *Maryland Casualty Co.*, 312 U.S. at 273, 61 S.Ct. at 512; *see Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 735, 6 USPQ2d 1685, 1688 (Fed.Cir.1988) (the sole jurisdictional requirement is that there be a real and immediate conflict); *Telectronics Pacing Sys., Inc., v. Ventritex, Inc.*, 982 F.2d 1520, 1526, 25 USPQ2d 1196, 1201 (Fed.Cir.1992); *Lang v. Pacific Marine and Supply Co.*, 895 F.2d 761, 764, 13 USPQ2d 1820, 1821 (Fed.Cir. 1990).

■ As applied to declarations of patent rights and relationships, for an actual controversy more is required than the existence of an adversely held patent. Thus in patent litigation there has evolved a pragmatic two-part test for determining declaratory justiciability. There must be both (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity. *Jervis B. Webb Co. v. Southern Sys., Inc.*, 742 F.2d 1388, 1398–99, 222 USPQ 943, 949 (Fed.Cir.1984). The element of threat or reasonable apprehension of suit turns on the conduct of the patentee, while the infringement element depends on the conduct of the asserted infringer. *Arrowhead*, 846 F.2d at 736, 6 USPQ2d at 1689. The purpose of the two-part test is to determine whether the need for judicial attention is real and immediate, *see Aetna Life Insurance Co.*, 300 U.S. at 239–41, 57 S.Ct. at 463–64, or is prospective and uncertain of occurrence.

■ Whether an actual controversy exists upon particular facts is a question of law, and is subject to plenary appellate review. *Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885, 888, 23 USPQ2d 1627, 1630 (Fed.Cir.1992). The district court's factual findings pertinent thereto are reviewed for clear error, in accordance with Fed.R.Civ.P. 52(a). *See Arrowhead*, 846 F.2d at 735, 6 USPQ2d at 1688.

### A

■ The district court found that Union Carbide did not threaten BP Chemicals or its licensees with suit for patent infringement, or place BP Chemicals or any licensee in reasonable apprehension of suit. BP Chemicals assigns reversible error to this finding.

The district court held an evidentiary hearing wherein witnesses testified as to what was said, what was intended, and what was perceived. When there were differences, the district court made credibility determinations. Witnesses for BP Chemicals stated that Union Carbide, in the course of attempting to license its own process technology, made clear to BP Chemicals and the potential licensees that Union Carbide would enforce the condensing mode patent against infringers. The Union Carbide witnesses stated that they did not threaten anyone, and that comments made in emphasizing the advantages of Union Carbide's patented technology were not threats of suit. Union Carbide stated that its practice is not to threaten its customers and business partners. BP Chemicals argued that the absence of infringement by its licensees evidences the intimidation successfully achieved by the direct and indirect threats of Union Carbide, and the adverse commercial effect on BP Chemicals as well as on its licensees.

Both sides relied on testimony, documents, and depositions. We outline the relationships between Union Carbide and the licensees of BP Chemicals:

#### 1. Quantum Chemicals, Inc.

Quantum Chemicals, through predecessor companies, became licensed under BP Chemicals technology for a polyethylene plant at Port Arthur, Texas, and under Union Carbide technology for a plant in Illinois. Union Carbide refused permission for operation at Port Arthur in the condensing mode without a license from Union Carbide. Although BP

Chemicals reportedly agreed to an increased indemnification, Quantum did not use the condensing mode at Port Arthur. When Quantum subsequently built a third polyethylene plant, it licensed the Union Carbide technology. BP Chemicals states that this shows that Quantum felt threatened by Union Carbide; Carbide states that it simply shows respect for Carbide's proprietary rights.

### 2. Texas Eastman Co.

A Union Carbide licensing team, in the course of a presentation on the Union Carbide technology, gave Texas Eastman representatives copies of certain patents including the '399 condensing mode patent, which were described as patents that "might be of interest". Texas Eastman later selected the BP Chemicals license. According to BP Chemicals, Texas Eastman built a larger plant than would have been needed if the condensing mode were employed. BP chemicals stresses the economic advantages of the condensing mode as support for its argument that there was an actual controversy arising from these relationships. BP Chemicals states that the need of its licensee to build a larger plant to achieve the desired volume of production "devalues" its technology, thus directly injuring BP Chemicals.

### 3. Chevron Oil Co.

BP Chemicals and Union Carbide also competed to license their processes to Chevron Oil. Union Carbide's written sales materials included the statement: "We have strong patent positions on key elements of gas phase technology that we feel give our licensees an advantageous position." Witnesses from both Union Carbide and Chevron testified that discussion of patents occupied only a few moments of their lengthy discussion of the Union Carbide technology and license proposals. During this discussion Union Carbide stated that its patent counsel had advised that the '399 patent was a strong patent, and that the courts now tend to uphold patents. Chevron's witness testified that he interpreted these statements as a threat, that he therefore had Chevron's patent counsel again review the '399 patent,

and that when he recommended that Chevron take the BP Chemicals license he advised his management that there was "the potential of a lawsuit" by Union Carbide. Chevron's witness testified that he told Union Carbide in a subsequent conversation that Chevron's patent counsel had "a different opinion" of the '399 patent, and that Carbide asked if Chevron had increased indemnification from BP Chemicals. Union Carbide's witness testified that there was no threat or intention to threaten Chevron, and that the discussion of patent issues arose in stressing the advantages of the Union Carbide process. Union Carbide states that it has many commercial relationships with Chevron, as supplier and as customer, and would never threaten a law suit without first attempting to resolve any differences.

BP Chemicals states that Union Carbide crossed the line to actual threat of suit, in the exchanges with Chevron. BP Chemicals faults the district court with being overly concerned with whether Union Carbide representatives used the word "sue" in their conversations. Declaratory judgment jurisdiction does not require direct threats. Indirect threats or actions that place the declaratory plaintiff in reasonable apprehension of suit will meet the test for a declaratory judgment action. *See Arrowhead,* 846 F.2d at 736, 6 USPQ2d at 1689.

BP Chemicals argues that in finding that Union Carbide representatives did not threaten the potential licensees, the district court employed a subjective instead of an objective standard in assessing whether the licensees were in reasonable apprehension of suit. Indeed, it is the objective words and actions of the patentee that are controlling. Although such words and actions are not viewed in isolation of their intended effect on the listener, a subjective apprehension is insufficient without objective substance. *See International Medical Prosthetics Research Assocs., Inc. v. Gore Enter. Holdings, Inc.,* 787 F.2d 572, 575, 229 USPQ 278, 281 (Fed. Cir.1986). The district court discussed the actions and statements of those concerned, determined credibility when testimony diverged, and applied an objective standard. We do not discern reversible error in the

court's procedures or the conclusion that Union Carbide did not threaten BP Chemicals or the licensees or place them in reasonable apprehension of suit.

BP Chemicals argues that Union Carbide's refusal to promise, at the hearing, that it will not enforce the '399 patent against the BP licensees, supplies the requisite threat or apprehension in support of declaratory jurisdiction. Indeed, Union Carbide made clear in its testimony that the '399 patent would not be abandoned as a property right, and that it retained the right to sue infringers. However, the district court found overriding significance in the statement by BP Chemicals' Managing Director that the reason BP Chemicals brought this declaratory action was:

> What we wanted to do was to make sure that we had been seen to initiate action to protect our licensees. It's psychologically very negative, or at least in our judgment it was.

The district court concluded that this declaratory action was brought as a marketing strategy, and not in response to a threat by Union Carbide or reasonable apprehension of suit. The district court observed that Union Carbide's representatives repeatedly expressed their desire to resolve amicably any problems that might arise, in discussion with BP Chemicals as well as with potential licensees.

■ Although a patentee's refusal to give assurances that it will not enforce its patent is relevant to the determination, *see C.R. Bard,* 716 F.2d at 881, 219 USPQ at 203–04, this factor is not dispositive. *See Shell Oil,* 970 F.2d at 889, 23 USPQ2d at 1631 (considering the circumstances surrounding statement of intent to enforce patent). The district court's finding that Union Carbide did not threaten suit for patent infringement, or place BP Chemicals or its licensees in reasonable apprehension of suit, has not been shown, in the circumstances, to be clearly in error.

### B

■ There is not always an easy demarcation between a reasonable apprehension on the part of a would-be infringer, and the situation whereby a patent, by its existence, inhibits unauthorized practice of its subject matter. The relationships are rarely as simple as they appear in judicial opinions. Indeed, we view this case as presenting a close factual question on the issue of reasonable apprehension of suit. However, our affirmance of the district court's ruling against the declaratory action is buttressed by the undisputed fact of the absence of infringing activity.

BP Chemicals points to Chevron's testimony that it intended to use the condensing mode. Apparently Chevron had not done so at the time suit was filed, and indeed at the time this appeal was argued. Although it is the situation at the time suit was filed that establishes the existence *vel non* of an actual controversy, *Jervis B. Webb Co.,* 742 F.2d at 1398, 222 USPQ at 949, subsequent events can reinforce the correctness of the conclusion. *Cf. C.R. Bard,* 716 F.2d at 881, 219 USPQ at 203–04 (considering statements made subsequent to filing declaratory action as part of the totality of the circumstances).

■ The district court made no findings with respect to actual or intended infringement. However, accepting BP Chemicals' statement that its licensees would use the condensing mode but for the '399 patent, an interest in practicing the invention of another does not satisfy the infringement element of the two-part test for actual controversy in patent cases. *See International Medical Prosthetics Research Assocs.,* 787 F.2d at 576, 229 USPQ at 281 (declaratory judgment procedure is not available to attack a patent in court, simply because it is there). That a superior process is patented to another, and unavailable for use without a license, does not of itself create a justiciable controversy.

### C

■ BP Chemicals argues that the Federal Circuit's two-part test does not accommodate the situation where a non-manufacturing licensor's business is undermined by threats directed to its actual or potential licensees. BP Chemicals states that if it is

not permitted to protect its licensing business by this declaratory action it will be competitively prejudiced, in an immediate and concrete way.

BP Chemicals alleges several present injuries flowing directly from the possibility of suit by Union Carbide and the inhibitory effect of the '399 patent. BP Chemicals asserts a reduction in royalty income from Quantum; that the value of its license to Texas Eastman has been diminished in view of the overbuilding that was needed to achieve the desired production; and that each of its licensees sought additional assurances and indemnification from BP, resulting in additional fiscal responsibility as well as potential liability. BP Chemicals states that this impact is actual, not theoretical, and is being felt now, not in the future.

The criteria underlying institution of a declaratory action derive from the constitutional requirement that there be a case of actual controversy. *Aetna Life Ins. Co.*, 300 U.S. at 239–41, 57 S.Ct. at 463–64. Parties petitioning the federal courts must have standing to assert their claims:

> [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant", and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision".

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted). Plaintiffs must assert their own legal rights and interests. *Id.; see Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). BP Chemicals states that its legal interests are of two types: first, its competitive interest in licensing technology wherein the condensing mode would be available to its licensees; and second, BP's liability for indemnification should its licensees be sued for infringement, including any corollary liability for contributing to or inducing infringement.

The agreement to defend or indemnify a third person does not provide the actual controversy whereby the defender or indemnitor may bring a declaratory action on its own behalf when there is no actual controversy involving the indemnitee. The indemnitor's standing in such case is derivative, not original and independent. Similarly, without direct infringement there can not be contributory infringement or inducement of infringement. *Met–Coil Sys. Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 687, 231 USPQ 474, 477 (Fed.Cir.1986). Thus BP Chemicals' interest, either as an indemnitor or based on possible liability for contributory infringement or inducement to infringe, is no more definite than that of its licensees. Similarly, while BP Chemicals' interest as patent licensor may be adversely affected by Union Carbide's competitive activity, if the latter does not constitute a threat to sue BP Chemicals' potential licensees, then BP Chemicals can not bring a declaratory judgment action against Union Carbide.

We note the concern of the district court that this declaratory action would not resolve all of the issues raised, since none of the licensees is party to this action. Indeed, at the evidentiary hearing BP Chemicals stated the position that a decision on the '399 patent in this case would not bind its licensees. A court may decline to exercise declaratory judgment jurisdiction if it would not afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding. *See* Edwin Borchard, *Declaratory Judgments* 299 (2d ed. 1941). The absence from this declaratory action of those who are described by BP Chemicals as intending to infringe the '399 patent reinforces the district court's finding that this action was brought for marketing and competitive purposes. As we have discussed, the existence of a patent held by a competitor is insufficient basis for a declaratory action to invalidate the patent.

The district court's dismissal of the action for failure to present an actual controversy is

AFFIRMED.