**WRIGHT MEDICAL TECHNOLOGY, INC., Plaintiff,**

v.

**OSTEONICS CORPORATION and Stryker Corporation, Defendants.**

**No. 94–2650 G.**

United States District Court, W.D. Tennessee, Western Division.

Oct. 26, 1995.

John J. Mulrooney, Wolff Ardis, P.C., Memphis, Tennessee, William E. McDaniels, Eric N. Lieberman, Williams & Connolly, Washington, D.C., for plaintiff.

Charles G. Walker, R. Alan Pritchard, Jr., Heiskell Donelson Bearman Adams Williams & Caldwell, P.C., Memphis, Tennessee, Roy Henry Wepner, William L. Mentlik, Lerner David Littenberg Krumholz & Mentlik, Westfield, New Jersey, for defendants.

## AMENDED ORDER OF DISMISSAL

GIBBONS, Chief Judge.

Before the court is the motion of defendants, Osteonics Corporation and Stryker Corporation, for dismissal pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. This is an action for declaratory judgment filed by plaintiff, Wright Medical Technology, Inc. (Wright), to determine whether its new product, the BRIDGE Hip Implant, infringes on U.S. Patent No. 5,133,772 ('772 patent) held by defendants.[1] For the reasons set forth below, the court finds that no actual controversy exists and grants defendants' motion for dismissal under Rule 12(b)(1).[2]

Both Osteonics and Wright are medical technology companies in the business of developing, manufacturing, and marketing prosthetic devices. Osteonics is a fully owned subsidiary of defendant Stryker Corporation. Plaintiff Wright, a new corporation, was formed on July 1, 1993 through the sale of assets by Dow Corning Wright Corp. (DCW), a subsidiary of the Dow Corning Corp.

The parties are involved in two other unrelated patent litigations, one in Massachusetts and one in New Jersey, concerning knee implant devices which each company produces. Wright has become a party in both actions because of its status as DCW's successor. In the Massachusetts case, DCW filed suit in April 1991 naming Osteonics as defendant. The New Jersey litigation was filed by Osteonics against DCW in November 1991.

The first dialogue between the parties regarding the BRIDGE Hip device occurred on February 1, 1994. Jack Parr, Executive Vice President of Wright, telephoned Ned Lipes,

---

1. In its documents, plaintiff refers to the '772 patent as the "Hack patent." The patent covers an artificial hip joint developed and produced by defendants.

2. As a preliminary matter, plaintiff has moved the court to strike Defendants' Reply Memorandum in Support of Their Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(1) and (6), on the basis that Local Rule 11 does not provide for such a memorandum. The court declines to strike the response, and in fairness considers both defendants' reply and plaintiff's surreply briefs.

President of Osteonics, to discuss settlement of the unrelated patent litigations in Massachusetts and New Jersey. Because Lipes was out of town, Parr spoke with Alfred Zarnowski, Director of Special Projects for Osteonics. The two spoke amicably, and Parr alleges that they reached an agreement to voluntarily dismiss the Massachusetts and New Jersey litigations while cross-licensing the products disputed in those cases. Parr alleges that they settled upon a figure of $200,000, to be paid by Wright to Osteonics in recognition of legal fees. Zarnowski disputes that the parties ever reached final agreement on a monetary sum.

Near the end of their discussion, Parr raised the issue of the BRIDGE Hip Implant. In Parr's version of the story, Parr brought up the issue to pursue cross-licensing of the BRIDGE Hip and the '772 patent so that the two companies could form a cooperative relationship in the area of hip prosthetics to better compete against market leaders. Parr alleges he never insinuated that the Bridge Hip would infringe the '772 patent. The conversation then concluded with Parr offering to let Osteonics review Wright's patent application for the BRIDGE Hip Implant.

Zarnowski recounts the conversation differently. He alleges that Parr raised the issue of the BRIDGE Hip stating that there was a possible infringement problem. Parr then alleged that the '772 patent was invalid based on prior art literature in the possession of Wright. Zarnowski interpreted this as a threat. Zarnowski recounts that Parr then discussed the possibility of cross-licensing to resolve the infringement issue. The conversation concluded with Parr agreeing to let Osteonics review not only the Hip Bridge patent information, but also the prior art invalidating the '772 patent, and the opinion of Wright's counsel regarding invalidity. Parr does not remember offering the opinions of counsel, but he does not deny raising the issue of prior art and offering this art for Osteonics' perusal.

On February 4, Parr sent a letter to Osteonics' president Lipes, summarizing the telephone conversation between Parr and Zarnowski and asking for confirmation of the terms of the agreement to settle the two pending litigations. Osteonics never sent a reply letter, allegedly because Zarnowski and Parr had agreed over the phone to meet only a few weeks later at a gathering of the American Association of Orthopaedic Surgeons (AAOS).

On February 25, Parr and Zarnowski met at the AAOS conference to further discuss settlement of the New Jersey and Massachusetts litigations. Parr alleges that Zarnowski adopted a confrontational demeanor, and changed the terms of their earlier agreement, now demanding $1.8 million to settle only the New Jersey litigation. According to Parr, Zarnowski also stated that he (Zarnowski) and Lipes had viewed the BRIDGE Hip at a booth at the AAOS meeting and that they believed it did infringe the '772 patent. Zarkowski then stated something to the effect of "[w]e can stop that."

Zarnowski disagrees. Zarnowski alleges that he met with Parr twice at the AAOS, and that during the first meeting Parr urged him to visit the booth and view the BRIDGE Hip. Zarnowski did so, accompanied by Lipes. Zarnowski viewed the BRIDGE Hip only briefly, handling it for about 30 seconds, all the while being watched hawkishly by Wright employees. Zarnowski was not offered any literature on the product, and he did not see any accompanying the display. He therefore assumed that the BRIDGE Hip was not being promoted for sale, but rather was being shown at the booth to determine if it would generate any interest. After leaving the booth, Zarnowski reviewed the '772 patent. He then met Parr a second time, primarily to discuss settlement of the other litigations. Zarnowski says that during this conversation he briefly mentioned that he believed the BRIDGE Hip might infringe the '772 patent. However, Zarnowski alleges he made no indication Osteonics would enforce the patent, because he had insufficient knowledge of the BRIDGE Hip product at this time to determine if a lawsuit was even desirable.

On March 16, Thomas Patton, General Counsel for Wright, called Zarnowski to discuss settlement of the New Jersey and Massachusetts cases. Zarnowski does not now

recall this conversation. Patton alleges that they briefly discussed the need for a confidentiality agreement before allowing Osteonics to review the BRIDGE hip technology. Patton alleges that Zarnowski also asked for opinion of Wright's counsel on the issue of validity of the '772 patent, but that he (Patton) refused. In addition, Patton alleges that Zarnowski stated that the BRIDGE Hip seen at the AAOS booth infringed the '772 patent.

Patton sent a draft of the proposed confidentiality agreement to Zarnowski on April 11. Over the next four months, the two parties bickered over terms of the agreement, with Osteonics asking to see the prior art literature and opinion of counsel, and Wright refusing. Osteonics sent a revised draft on May 18, and Wright replied with further revisions on June 29. The last proposal was sent by Osteonics on August 8, three days after learning of this declaratory judgment suit. The parties never reached a compromise solution prior to the filing of this suit.[3] Osteonics' only exposure to the BRIDGE Hip, other than Zarnowski's viewing at the AAOS trade show, was a brief description contained in a Wright newsletter.

In May, at the request of Wright, Osteonics agreed to mediate the New Jersey litigation in accordance with the established process of the federal district court there. The mediation begun on July 7, with the parties attempting to settle both the New Jersey and Massachusetts litigations. During the process, Wright attempted to expand the discussion to include the BRIDGE Hip product, asking for a license under the '772 patent to resolve any potential infringement problem. Osteonics refused to discuss the matter in connection with that mediation, alleging that it had insufficient knowledge of the BRIDGE Hip to make any decisions at that time. Osteonics also notes the parties had not raised this issue in their position statements submitted to the mediator prior to the sessions. The mediation was unfruitful, and as it came to a close Zarnowski told Patton "We'll see you in court."

Between May and July, Wright permitted the inventor of the BRIDGE Hip product, an orthopedic surgeon, to implant 20 BRIDGE Hips in patients for clinical evaluation purposes. Then, on the weekend beginning Friday, August 5, Wright hosted a seminar to discuss the BRIDGE Hip device with orthopedic surgeons. Wright filed this action for declaratory judgment against Osteonics on the same day.

Defendant now moves the court for dismissal on three different bases. Defendant argues that the court lacks jurisdiction, and in the alternative, the court should decline to exercise its discretionary jurisdiction in this case. Defendant last argues that the court should dismiss the complaint for failure to state a claim. Because the court finds a lack of jurisdiction under the Declaratory Judgment Act, the court does not reach defendant's second and third arguments.

■■■ When reviewing a Rule 12(b)(1) motion challenging the factual basis of plaintiff's allegations of jurisdiction, the court is not restricted to the pleadings, but may look to extrinsic evidence such as affidavits and deposition testimony. *Ohio Nat. Life Ins. Co. v. U.S.*, 922 F.2d 320, 325 (6th Cir.1990). Only uncontroverted factual allegations are accepted as true, and where a factual controversy arises, the court must weigh conflicting evidence and make any factual findings necessary to a determination of whether jurisdiction actually exists. *Id.; Cedars–Sinai Medical Center v. Watkins*, 11 F.3d 1573, 1583 (Fed.Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2738, 129 L.Ed.2d 859 (1994).

■■■ Plaintiff brings its claims pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201. Under the Act, a court has subject matter jurisdiction only if a case or controversy existed between the parties at the time the complaint was filed. *Indium Corp. of Amer. v. Semi–Alloys, Inc.*, 781 F.2d 879, 882 (Fed.Cir.1985), *cert. denied,* 479 U.S. 820, 107 S.Ct. 84, 93 L.Ed.2d 37 (1986). Plaintiff bears the burden of showing by a preponderance of the evidence that this jurisdictional

---

**3.** The parties subsequently reached a suitable agreement, after which Osteonics examined the BRIDGE Hip and relevant literature.

requirement is met. *International Harvester Co. v. Deere & Co.,* 623 F.2d 1207, 1210 (7th Cir.1980); *Century Indus., Inc. v. Wenger Corp.,* 851 F.Supp. 1260, 1263 (S.D.Ind. 1994).

For declaratory judgment actions brought in the context of patent law, the Federal Circuit has set out a pragmatic two-part test for determining the existence of a case or controversy. There must be both (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity. *BP Chemicals Ltd. v. Union Carbide Corp.,* 4 F.3d 975, 979 (Fed. Cir.1993). Thus, more is required than the mere existence of an adversely held patent. *Id.* Courts look to the actions of the patentee in applying the first prong, and the actions of the alleged infringer in determining the second. *Arrowhead Indus. Water Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 736 (Fed.Cir. 1988).

■ Plaintiff has clearly met the second prong of the test by demonstrating that it has produced the BRIDGE Hip device, implanted twenty units in patients, and promoted its sale. *See Kasper v. Cooper Canada Ltd.,* 688 F.Supp. 347, 351–52 (N.D.Ill.1988).

The central issue before the court, therefore, is whether defendant's acts were sufficient to create a reasonable apprehension of suit, the first element of the test.

■ In determining the existence of reasonable apprehension, the court is looking for acts or words of the defendant which amount to extra-judicial patent enforcement, i.e., intimidation which communicates to the reasonable plaintiff that it must submit to the patentee's demands or act at its peril. *See Arrowhead,* 846 F.2d at 735. An explicit threat or express charge of infringement[4] is sufficient to create reasonable apprehension, but is not necessary; conduct will suffice. *Goodyear Tire & Rubber v. Releasomers,* 824 F.2d 953 (Fed.Cir.1987). The court must look to the "totality of the circumstances." *BP,* 4 F.3d at 978; *C.R. Bard, Inc. v. Schwartz,* 716 F.2d 874, 880 (Fed.Cir.1983).

In the instant case, plaintiff presents four bases for its argument that it had a reasonable apprehension of imminent suit at the time it filed this declaratory judgment action: alleged threats by Zarnowski and Osteonics' counsel Keith Gilman, the prior conduct of Osteonics in filing the New Jersey suit against DCW, the history of litigation between the parties, and the contentiousness of Osteonics in settlement and licensing negotiations.

---

**4.** The Federal Circuit has only recently adopted the "explicit threat" moniker, using it to replace the phrase "express charge of infringement" in the test for jurisdiction. *Compare BP Chem.,* 4 F.3d at 978; *Synbiotics v. Regents of the Univ. of Calif.,* No.'s 93–1253, 94–1079, 1994 WL 463947, 1994 U.S.App. LEXIS 23902, 32 U.S.P.Q.2d (BNA) 1835 (Fed.Cir., Aug. 29, 1994), *cert. dismissed,* —— U.S. ——, 115 S.Ct. 928, 130 L.Ed.2d 779 (1995), *with Shell Oil,* 970 F.2d at 888; *Arrowhead,* 846 F.2d at 736. Presumably, this is because the "explicit threat" language better describes the policy behind the rule; it more clearly distinguishes between a mere assertion of infringement made in the course of licensing negotiations, which does not create reasonable apprehension, and a full-blown accusation of patent infringement in the nature of a threat, which clearly does create a justiciable controversy. *Compare Trippe Mfg. Co. v. American Power Conserv. Corp.,* 46 F.3d 624, 628 (5th Cir.1994); *BP Chem.,* 4 F.3d at 978–981; *Shell Oil Co. v. Amoco Corp,* 970 F.2d 885, 888–89 (Fed.Cir.1992); *West Interactive Corp. v. First Data Resources,* 972 F.2d 1295, 1298 (Fed.

Cir.1992); *Ryobi America Corp. v. Peters,* 815 F.Supp. 172, 174 (D.S.C.1993), *with Cardinal Chem. Co. v. Morton Intern., Inc.,* 508 U.S. 83, 96–97, 113 S.Ct. 1967, 1975, 124 L.Ed.2d 1 (1993); *Genentech, Inc. v. Eli Lilly & Co.,* 998 F.2d 931, 937 (Fed.Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1126, 127 L.Ed.2d 434 (1994); *Nalco Allied Chem. Co. v. Allied Colloids, Ltd.,* 222 U.S.P.Q. (BNA) 969 (D.D.C.1983). Thus, the "explicit threat" language makes clear that courts are actually looking for intimidation and extra-judicial patent enforcement, which are necessarily present in an express charge of infringement. Accordingly, the court views both the "explicit threat" and "express charge of infringement" labels as the same standard. *But see Societe de Conditionnement en Aluminium v. Hunter Engineering Co.,* 655 F.2d 938, 944 (9th Cir.1981) (suggesting a difference between "threats" and "express charges"); *Oce–Office Systems, Inc. v. Eastman Kodak Co.,* 805 F.Supp. 642 (N.D.Ill.1992) (interpreting "express charge" to be a lower threshold than a "threat"). However, even if the two standards are different, plaintiff clearly fails to establish either.

The court deals first with the alleged threats made by Osteonics personnel. Plaintiff points to five statements which it argues created a reasonable apprehension of suit: (1) Zarnowski's statement at the AAOS that the BRIDGE Hip infringed the '772 patent, (2) Zarnowski's alleged statement at the AAOS that "[Osteonics] can stop that," (3) Zarnowski's alleged statement on the phone to Patton that the BRIDGE Hip infringed the '772 patent, (4) Zarnowski's "[s]ee you in court" statement at the close of the New Jersey litigation, and (5) a statement by Osteonic's counsel Keith Gilman, in a letter sent to Patton discussing the confidentiality agreement, that "Al Zarnowski has advised [me] that at the time he discussed the '772 patent with you [Patton] and Jack Parr vis-a-vis infringement by virtue of the hip joint prosthesis...."[5]

▮ First, the court finds that statements (4) and (5) clearly are not threats. Zarnowski's "[s]ee you in court" comment, made in context of failed negotiations concerning the New Jersey litigation, obviously refers to the then-inevitable New Jersey trial. As Osteonics had refused to discuss the BRIDGE Hip in those negotiations, plaintiff could not assume this statement referred to the BRIDGE Hip. As for the sentence in Keith Gilman's letter, concerning "vis-a-vis infringement," this is obviously intended only to identify the earlier conversation between Zarnowski and Patton, not to charge plaintiff with patent infringement. Neither of these communications, therefore, can be construed as a threat.

Plaintiff's strongest argument for a threat is Zarnowski's alleged statement to the effect of "[w]e can stop that," made at the AAOS. Parr cannot remember the statement exactly, however, and instead of relaying to the court what Zarnowski said, Parr relates his interpretation of its "effect." Without knowing the statement, the court cannot now determine whether Parr's interpretation is objectively reasonable and cannot find that the statement was a threat.

▮ Thus, the only remaining statements which were possibly threatening are Zarnowski's two statements, one at the AAOS to Parr, and the other on the phone to Patton, of Zarnowski's belief that the BRIDGE Hip infringed the '772 patent.[6] Both of these statements were made in the course of discussions initiated by Wright,[7] however, and amounted to no more than the adoption of a negotiating position by Osteonics. At the AAOS, Parr actually solicited Zarnowski's opinion on infringement, by requesting that Zarnowski view the BRIDGE Hip so that the two could begin negotiations on a licensing agreement. Zarnowski's statement on the phone with Patton was again in the context of licensing negotiations, and is "more akin to jawboning" than to an express charge of infringement. *See West Interactive*, 972 F.2d at 1298; *Shell Oil*, 970 F.2d at 888–89 (statements that product "falls within" or "may be covered" by patent, and acknowledgement by patentee that will enforce patent held to be merely "jawboning"); *Century Indus., Inc. v. Wenger Corp.*, 851 F.Supp. 1260, 1261–63 (S.D.Ind.1994) (letter saying

---

5. The full paragraph in the letter reads:

In this regard, Al Zarnowski has advised that at the time he discussed the '772 patent with you [Patton] and Jack Parr vis-a-vis infringement by virtue of the hip joint prosthesis offered for sale by Wright Medical Technology at the 1994 AAOS, at least Mr. Parr had offered Osteonics the opportunity to also review opinions respecting the '772 patent. In Mr. Zarnowski's view, this was an important aspect of reviewing a possible cross-licensing situation, and it must be part of this agreement.

Ex. C to Motion of Defendants Osteonics Corp. and Styker Corporation to Dismiss this Action Pursuant to Fed.R.Civ.P. 12(b)(1) or 12(b)(6).

6. Zarnowski admits the statement at the AAOS, but cannot recall the phone conversation with

Patton. However, April 11 correspondence from Patton to Zarnowski, which included a draft of the proposed confidentiality agreement, refers to this conversation and was sent as a follow-up. Ex. A to Decl. of Thomas M. Patton, Esq. Thus the court finds that the conversation occurred, and accepts Patton's account.

7. The court finds it clear that Wright's president, Jack Parr, approached Osteonics about the possibility of infringement of the '772 patent by the BRIDGE Hip. Parr asserts he only raised the issue of the BRIDGE Hip to pursue a partnership between the two companies for their similar products; the court finds this disingenuous, because clearly if this was his purpose the discussion of Wright's prior art invalidating the '772 patent would not have arisen.

that product "falls within scope" of patent not an express charge creating reasonable apprehension); *Ryobi,* 815 F.Supp. at 174 (statement that it "appears" that product "falls literally within" patent not an express charge of infringement creating reasonable apprehension). *See also Trippe,* 46 F.3d at 628 (cease and desist letter stating that product "infringes" trademark not an express threat sufficient to create reasonable apprehension).

This conclusion is made certain by a fatal inconsistency in Wright's arguments; the fact that the two parties were in the process of negotiating a confidentiality agreement during all the events which Wright alleges led it to fear a lawsuit. The very purpose of the confidentiality agreement was to provide Osteonics an opportunity to examine the BRIDGE Hip so that it could make an informed decision on infringement and then pursue cross-licensing.[8] Thus Wright knew that Osteonics lacked vital information and could not be levelling a charge of infringement. *See American Needle and Novelty Co. v. Schuessler Knitting Mills,* 379 F.2d 376, 379 (7th Cir.1967) (finding that "[t]he owner of a patent should have the privilege of making a fair investigation as to the possible infringement of his patent without calling down on his head ... [a] declaratory judgment suit ...."). Accordingly, the court finds that Zarnowski's statements amounted to no more than "jawboning," and Wright understood this. Therefore, these statements could not put Wright in objectively reasonable apprehension of suit.

█ This leads to Wright's second basis for alleging reasonable apprehension, that Osteonics has filed suit in the past with only slight knowledge of the allegedly infringing device, and therefore might do so again. Wright points to the New Jersey litigation between the parties, in which Osteonics filed suit against DCW while licensing negotiations were still ongoing, and before Osteonics had obtained a model of the device. In that suit, however, Osteonics had seen several demonstrations of the device at trade shows, and had acquired sales literature and surgical protocols regarding the device. This is significantly more exposure than in the instant case. In addition, in the New Jersey litigation, Osteonics had given advance warning of possible suit. Specifically, Osteonic's president Ned Lipes stated at the opening of licensing discussions that he felt there was a basis for bringing an infringement suit against DCW. Moreover, in the New Jersey case the parties were engaged in serious licensing negotiations when Osteonics sued; in the instant case, the parties could not even begin negotiations because they needed first to agree on a confidentiality agreement which would enable Osteonics to form an opinion on the BRIDGE Hip. Therefore, the court finds it clear that Osteonics' prior conduct gave Wright no reasonable apprehension that Osteonics was preparing to bring suit for infringement of the '772 patent.[9]

█ Wright also points to the history of litigation between the parties as a basis for its reasonable apprehension. However, the New Jersey and Massachusetts litigations which plaintiff identifies were originally filed between Osteonics and DCW, not Osteonics and Wright. Wright became a party to the preexisting suits only when it acquired an interest in the assets of DCW. Thus Wright and Osteonics are not old and contentious adversaries. To the contrary, their relation-

---

8. It was for this purpose that Parr, on the phone with Zarnowski, offered to let Osteonics review the BRIDGE Hip patent application. *See* Ex. C to Decl. of Thomas M. Patton (stating in correspondence that "[t]he only purpose of this Confidentiality Agreement ... is so that Osteonics might have an opportunity to consider licensing that application"). The parties continued to negotiate a means by which Osteonics would be able to view the application, even after Zarnowski's viewing of the BRIDGE Hip at the AAOS booth. Thus, the parties understood that Zarnowski had done only a cursory inspection and that Osteonics needed more information before it could adopt a serious position on infringement and conduct licensing negotiations.

9. Defendants also point out one other significant difference between the New Jersey suit and the instant case. In the New Jersey suit, DCW already had a developed market for the allegedly infringing product and steady, lucrative sales of the surgical kits in which the device would be included. Therefore, Osteonics had much greater interest in bringing suit than here, where Wright's BRIDGE Hip device may never even reach the level of commercial sales.

ship has recent origins; Wright was only seven months old at the time of the February phone call by Parr. In addition, Parr recognized that the hostility which has prevented a more amicable settlement of the New Jersey and Massachusetts disputes runs between Osteonics and DCW, not Osteonics and Wright.[10] The only suit ever filed between the Osteonics and Wright is the instant one, initiated by Wright. Thus, the court finds that the history of litigation could not have contributed to reasonable apprehension of suit by Osteonics concerning the '772 patent.[11]

██ Wright last alleges that Osteonics has been combative and unreasonable in settlement and licensing negotiations between the parties, thus contributing to plaintiff's fear of imminent suit. Plaintiff's contentions, however, are without merit. First, Osteonics agreed to submit to mediation in the New Jersey suit, and has engaged in numerous settlement discussions with plaintiff. Second, Osteonic's refusal to discuss the BRIDGE Hip device during the mediation was not unreasonable, because Osteonics lacked sufficient knowledge at that time to make informed decisions about the product. Indeed, Wright's attempt to marshal the BRIDGE Hip into these discussions may itself have been a tactical maneuver on its part.

Wright also tries to paint Osteonics as combative because it broke an oral agreement between Zarnowski and Parr to voluntarily settle the Massachusetts and New Jersey litigations. However, the evidence substantiates Zarnowski's argument that the two never reached final agreement because they could not settle on a monetary amount. In Parr's letter confirming the discussion, dated February 4, Parr states:

"... we would be willing to pay you an additional two hundred thousand dollars ($200,000). (Please understand that this is not an offer to negotiate further. However, if too much time passes and unnecessary legal fees continue to mount, the monetary component of this agreement would lapse.)"

This language indicates that the $200,000 was an offer, rather than merely a settled term of an earlier agreement. Thus, Osteonics' later negotiations for settlement were not unreasonable or combative.

The court concludes, looking at a totality of the circumstances, that Wright has failed to carry its burden of proving a case or controversy exists. Wright cannot show it was ever in objectively reasonable apprehension that Osteonics would file suit for patent infringement. Osteonics was not threatening in its words or actions, and Wright understood this, knowing that Osteonics lacked sufficient information to evaluate the infringement status of the BRIDGE Hip.

Looking at the facts existing at the time this action was filed, the relations between the parties may never have ripened into a controversy necessary for adjudication, and Osteonics has a right not to be forced to defend an unnecessary lawsuit. Lacking a case or controversy, therefore, the court finds that this declaratory judgment action must be dismissed.

IT IS SO ORDERED.

---

10. In his affidavit, Parr states that "[Zarnowski] indicated to me that there was so much animosity between DCW and Osteonics stemming from the pending litigations that Osteonics was now demanding $1.8 million to settle the New Jersey litigation alone." Decl. of Jack E. Parr ¶ 11.

11. Furthermore, even if the past history would make Wright fearful of potential litigation, Wright could not have been fearful at this point in the negotiations because Wright knew that Osteonics lacked sufficient information to make a serious conclusion regarding infringement by the BRIDGE Hip device of the '772 patent.