**SIERRA APPLIED SCIENCES, INC., Plaintiff,**

v.

**ADVANCED ENERGY INDUSTRIES, INC., Defendant.**

**No. CIV. 01–B–1796 (CBS).**

United States District Court, D. Colorado.

April 22, 2003.

Charles Henry Torres, Christine victoria Theisen, Charles H. Torres PC, Denver, CO, Susan E. Chetlin, Dahl & Oserloth, L.L.P., Denver, CO, Matthew Gabriel McFarland, Bieging, Shapiro & Burrus, LLP, Denver, CO, for plaintiff.

Thomas C. Grimm, Morris, Nicholes, Arsht & Tunnell, Wilmington, DE, Matthew B. Lehr, Latham & Watkins, Menlo Park, CA, Craig A. Neugeboren, Colley, Godward, LLP, Broomfield, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

BABCOCK, Chief Judge.

### I. Background

This is an action for declaratory judgment of patent non-infringement and invalidity, and for injunctive relief. Defendant states counterclaims for patent infringement of three of its U.S. patents. Defendant moves for dismissal for lack of subject-matter jurisdiction under Fed.R.Civ.P. 12(b)(1). A hearing was held on the motion to dismiss March 24, 2003. For the following reasons, I grant Defendant's motion.

### II. Facts

Plaintiff Sierra Applied Sciences is a Boulder, Colorado company that designs electrical power supplies for industrial sputter-deposition applications. Defendant Advanced Energy Industries, a Fort Collins, Colorado company, also designs such supplies. Sputter-deposition technology is used to coat architectural glass, integrated circuits, and electronic media (*e.g.*, compact discs) with a thin layer of metal or a metal compound. The object to be coated is called the substrate. The substrate is placed in a vacuum chamber along with the target material (*e.g.*, aluminum) and a reactive gas, usually argon. The electronic power supplies at issue here

are connected to the target assembly, which integrates the substrate with a group of magnets. When activated, the power supply forces electricity into the vacuum chamber through a cathode. The electricity ionizes the reactive gas, forcing the gas molecules to lose some of their negatively charged electrons.

The gas then consists of millions of positively charged ions. This ionized gas is called plasma. The negatively charged target assembly attracts the plasma to the target material. Upon impact with the target, plasma ions dislodge, or "sputter" atoms of the target material into the vacuum chamber space. Eventually, they migrate to the object to be coated-the substrate-and deposit on it.

The sputtering process often is plagued by the periodic occurrence of stray electrical discharges, or arcs, in the vacuum chamber. Arcs are movements of electricity between objects with a strong positive charge and those with a strong negative charge. In sputtering, an arc may occur between the target and the substrate. It may damage the coating of the substrate. An arc may also occur between the target and another part of the vacuum chamber. This also may degrade the coating quality. Arcs can be short-lived or continuous, and occur most often in reactive-sputtering processes where the metal target material reacts with a gas to form a compound coating.

Plaintiff and Defendant hold patents that address arcing problems. Plaintiff contends its patented technology addresses the problem differently than Defendant's technology. Plaintiff contends its technology consists of a circuit design for a pulsing power supply that reverses voltage on the sputtering cathode within the vacuum chamber. The effect of Plaintiff's design is that the plasma is "extinguished" during the voltage shift so the reactive gas retains its electrons. Plaintiff contends

Defendant's designs do not extinguish the plasma.

On December 1, 1995, Defendant wrote a letter through its attorneys to Plaintiff warning that Plaintiff might be using power-supply technology patented by Defendant. On January 15, 1996, Plaintiff responded to the letter, indicating that it manufactured less than five of the offending power supplies, and had changed its plans so it was no longer manufacturing any power supplies. On December 8, 1999, Defendant wrote another letter to Plaintiff warning it that Plaintiff was again manufacturing power supplies that used Defendant's patented technology. This time, Defendant wrote, "[w]e are now concerned that Sierra may have been surreptitiously copying AEI's technology." On December 15, 1999, Plaintiff's attorneys responded, saying they were investigating the matter. On November 13, 2000, Defendant wrote a third letter in which it indicated it had not received a response from Plaintiff, so would act as it deemed appropriate if no response was received within two weeks. Plaintiff commenced this action almost a year later.

### III. Law

### A. Fed.R.Civ.P. 12(b)(1)

 Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of jurisdiction over the subject matter." Fed.R.Civ.P. 12(b)(1). As courts of limited jurisdiction, federal courts may only adjudicate cases that the Constitution and Congress have granted them authority to hear. *See* U.S. CONST. art. III, § 2; *Morris v. City of Hobart,* 39 F.3d 1105, 1110 (10th Cir.1994). Statutes conferring jurisdiction on federal courts must be strictly construed. *See F & S Constr. Co. v. Jensen,* 337 F.2d 160, 161 (10th Cir.1964). The federal declaratory judgment statute provides "in a case of actual controversy within its jurisdiction ... any court of the United States ...

may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201.

 A Rule 12(b)(1) motion to dismiss "must be determined from the allegations of fact in the complaint, without regard to mere [conclusory] allegations of jurisdiction." *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir.1971). The burden of establishing subject-matter jurisdiction is on the party asserting jurisdiction. *See Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir.1974). Motions to dismiss pursuant to Rule 12(b)(1) may take two forms. First, if a party attacks the facial sufficiency of the complaint, the court must accept the allegations of the complaint as true. *See Holt v. United States*, 46 F.3d 1000, 1002–03 (10th Cir.1995). Second, if a party attacks the factual assertions regarding subject-matter jurisdiction through affidavits and other documents, the court may make its own findings of fact. *Id.* at 1003. A court's consideration of evidence outside the pleadings will not convert the motion to dismiss to a motion for summary judgment under Rule 56. *Id.* Here, Defendant attacks the factual assertions related to subject-matter jurisdiction underlying Plaintiff's Complaint, so I make findings of fact.

## B. Actual Controversy in Patent Declaratory Judgment Cases

"Whether a declaratory plaintiff's ability and definite intention to undertake a potentially infringing activity constitutes sufficient 'preparation' is a question of degree to be resolved on a case-by-case basis." *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 736 (Fed.Cir. 1988). The Federal Circuit has annunciated two versions of its two-pronged actual controversy test. Prong one is the same in both: "[t]he defendant's conduct must have created on the part of the plaintiff a reasonable apprehension that the defen-

dant will initiate suit if the plaintiff continues the allegedly infringing activity." *Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885, 888 (Fed.Cir.1992) (citations omitted).

Prong two varies between a narrow reading and a broader one. Under the narrower test, " plaintiff must actually have either produced the device or have prepared to produce that device" *Id.* "There is no justiciability if the plaintiff is merely considering the advisability of commencing production.... [T]he plaintiff must allege preparations for production which suggest that, but for a finding that the product infringes or for extraordinary and unforeseen contingencies, the plaintiff would and could begin production immediately." *Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc.*, 439 F.2d 871, 874 – 875 (1st Cir.1971). Defendant contends this is the most appropriate version of the test.

Plaintiff contends the proper version is the more inclusive one-whether Plaintiff is "making, using or selling a device" subject to an infringement charge under 35 U.S.C. § 271(a), or has meaningfully prepared to do so. *See BP Chems. v. Union Carbide Corp.*, 4 F.3d 975, 978 (Fed.Cir.1993). *See also,* C/O at 7. This version tracks the language in the U.S. patent infringement statute. *See* 35 U.S.C. § 271(a) ("Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention within the United States, or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.").

In *BP Chemicals*, 4 F.3d at 978, the Federal Circuit held that the second prong requires "present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity." *Id.* at 978. However, the court based this version of the second prong on the

"producing or preparing to produce version," citing *Jervis B. Webb Co. v. Southern Sys., Inc.,* 742 F.2d 1388, 1398–99 (Fed.Cir.1984). In *Jervis,* the Federal Circuit had described prong two as follows: "the plaintiff seeking a declaration of invalidity must have actually produced the accused device or have actually prepared to produce such a device." *Id.* at 1399, citing *Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc.,* 439 F.2d 871, 875 (1st Cir. 1971). Because the Federal Circuit seems to use both versions of its test more or less interchangeably, I apply both.

## IV. Discussion

■ There is no dispute that to withstand dismissal, Plaintiff must show that a case or controversy existed at the time it filed its Complaint on September 14, 2001. To do so, it must prove it was engaging in activity with its 2–kW and 150–kW power supplies that infringed Defendant's patents as of that date. The key is the level of Plaintiff's activity regarding each device.

*The 2–kW Power Supply*

Plaintiff's owner, Bruce Manley, testified that Plaintiff developed its 2–kW power supply in 1991–93 and manufactured it in 1994. By Fall 1995, Plaintiff had sold "12 or 13" of the devices. Manley testified that in Fall 1995 he recognized a decreased market interest in the 2–kW power supply coupled with an increased market need for a larger power supply. This led to Plaintiff's effort to develop a 150–kW power supply. Plaintiff wrote a letter to Defendant in 1996. It stated, "Sierra is no longer manufacturing [the 2–kW supply] and has no plans to do so in the future." Dfdt's Ex. A, ¶ 9. Manley admitted that the 2–kW was no longer being manufactured, and testified that Plaintiff still uses the 2–kW supply at its facility for testing and product development, two-to-three times per year.

The evidence shows Defendant was satisfied Plaintiff was not marketing the 2–kW power supply upon receipt of Plaintiff's 1996 letter and never communicated opposition to Plaintiff's internal use of the 2–kW device. Defendant stipulates that it does not care whether Plaintiff uses the 2–kW power supply internally. Therefore, I find and conclude Plaintiff never had reasonable apprehension of a patent infringement lawsuit regarding the 2–kW supply. Regardless of which version of the Federal Circuit actual-controversy test is applied, prong one is not met. Hence, as to the 2–kW power supply, Plaintiff has not proven there was an actual case or controversy in existence at the time it filed its Complaint September 14, 2001.

*The 150–kW Power Supply*

Since 1999 Plaintiff has been developing a 150–kW power supply to be used in sputtering and reactive-sputtering deposition systems. Manley testified it is now operational and in use at Plaintiff's facility. Defendant sent three warning letters to Plaintiff (1995, 1999, 2000) advising Plaintiff it would take appropriate action to protect its patents. *See* Pltf's Exhibits 6–8. In the December 1, 1995 and December 8, 1999 letters, Defendant wrote it would "aggressively defend its rights." The parties agree this admonishment created in Plaintiff "reasonable apprehension" of a forthcoming patent-infringement suit by Defendant. Prong one of the actual-controversy test is met.

Therefore, prong two is the pivotal issue: whether, as of the filing of the Complaint on September 14, 2001, Plaintiff was acting or preparing to act in a way that infringed Defendant's patents. Regardless of which test I employ, Plaintiff fails to meet this second prong.

The 150–kW power supply is in its second incarnation. The first prototype, designed by Plaintiff's designer, Charlie

Coleman, was destroyed during testing. This first version was depicted in Plaintiff's Complaint. After this prototype was destroyed, Bruce Manley testified Plaintiff's designer, Keith Billings, created another 150–kW model. Manley testified he had expected to introduce the model into the marketplace in Fall 2002. However, as of the hearing date, March 24, 2003, Plaintiff was still engaged in pre-marketing development of the 150–kW device. For example, Manley testified to the following:

1. Plaintiff was still testing the 150–kW device, and needed to do more testing;

2. The optional digital user-interface software had not been developed, and might take up to 6 months to develop;

3. The device had not entered the manufacturing phase;

4. A manufacturer had not been selected;

5. Beta versions would have to be released and tested before manufacture began; and

6. Accompanying advertising, marketing literature, or an operating manual do not exist.

The evidence shows that as of the filing of the Complaint on September 14, 2001, the 150–kW power supply Plaintiff brought to the hearing was not in existence because the first prototype (the Coleman device) was destroyed before the Complaint was filed.

Defendant inspected and tested the second prototype of the 150–kW power supply (the Billings device) for four hours at Plaintiff's facility on October 30, 2002. One year and nine months after Plaintiff's Complaint was filed, Defendant found no more than a conglomeration of circuit boards, wiring, and other components spread out on a "bread board," or test-bed work table in Plaintiff's facility. There is no evidence that a 150–kW supply existed at all in tangible form as of the filing date of the Complaint, September 14, 2001. Approximately two and one-half weeks before the hearing, Plaintiff inserted the components that were wired together on the "bread board" into the large, black, boxy housing that Plaintiff brought to the courtroom. This version of the "breadboard" component set-up has not been tested by Plaintiff or Defendant.

Plaintiff's designer Keith Billings testified in deposition that the second version of the 150–kW device was at least a year away from sale. See Deft's Ex. W, Billings Depo. at 107. Manley testified in deposition that he was "undecided" whether to market and sell the 150–kW device. See Deft's Ex. U, Manley Depo. at 47. This was approximately 10 months after Plaintiff filed its Complaint. Plaintiff's electrical engineer and programmer, Lowell Bond, testified that as of September 2002, the 150–kW was still "in development." Plaintiff's consulting engineer, Fazle Quazi, testified that he tested the "bread board" version of the 150–kW power supply in October 2002. He testified that the device would take some time to "commercialize." He testified that the device needs more testing and experimentation, and better packaging.

Regardless of how much design work or testing has been done on this second prototype as of the date of the hearing, the inquiry is whether a case or controversy existed on September 14, 2001. There is no persuasive evidence that Plaintiff was engaging in infringing activity with regard to any 150–kW device at the time it filed its Complaint. In fact, Plaintiff admitted in its response to Defendant's Interrogatory 1B that its only 150–kW power supply as of March 2002 was the first prototype that had been destroyed. See Deft's Ex. O, 3.

Applying the "produce or preparing to produce" version of the actual-controversy

test, I find and conclude that on September 14, 2001, Plaintiff was "merely considering the advisability of commencing production" of the 150–kW power supply. *Sweetheart Plastics,* 439 F.2d at 874–875. Plaintiff has made some progress toward actually producing the device since that time, but Plaintiff would not have been able to begin production immediately on September 14, 2001. *Id.* Plaintiff cannot immediately begin production even today.

Applying the "make, use, or sell" version of the test, *see BP Chem.,* 4 F.3d at 978, I find and conclude Plaintiff fails to meet it as well. At best, Plaintiff somehow used the 150–kW device in its facility for testing at some time. There is no evidence that a device was in existence for use as of September 14, 2001.

Plaintiff has never manufactured a 150–kW device. Its only prototype, presumably in working condition, has not been fully tested and is undergoing further improvements. Plaintiff had not sold any 150–kW devices as of September 14, 2001, and did not have concrete plans to do so then. Its plans for the 150–kW power supply are still murky. In addition to other substantial and unfinished testing, packaging, manufacturing, and marketing issues, Manley admits he wants a decision regarding infringement from this Court before deciding whether to market the 2–kW or finish testing and final assembly of the 150–kW supply. Plaintiff vaulted into court on a slender reed: its dubious "use" of the 150–kW device. This cannot withstand dismissal for lack of subject-matter jurisdiction.

What Plaintiff seeks is an advisory opinion. The evidence shows there was no case or controversy between the parties regarding either the 2–kW or the 150–kW power supplies on September 14, 2001. Therefore, this Court does not have subject-matter jurisdiction over Plaintiff's declaratory judgment action.

Accordingly, IT IS ORDERED THAT:

1) DEFENDANT's motion to dismiss for lack of subject-matter jurisdiction under Fed.R.Civ.P. 12(b)(1) is GRANTED;

2) PLAINTIFF's complaint is DISMISSED; and

3) DEFENDANT's counterclaim is DENIED WITHOUT PREJUDICE.